OPINION OF THE COURT
Martin Marcus, J.
The defendants in this case, Clarence Norman and Jeffrey Feldman, respectively, the chairman and the executive director of the Kings County Democratic Committee (the Party), are *796 jointly charged in a 22-count indictment with various counts and degrees of grand larceny by extortion and attempted grand larceny by extortion, coercion and attempted coercion, and conspiracy to commit those crimes. These charges arise out of the 2002 primary election campaigns of Judges Karen Yellen and Marcia Sikowitz for Kings County Civil Court. In essence, the allegations are that the defendants demanded that Yellen and Sikowitz campaign jointly, use a vendor designated by the defendants to produce and distribute campaign literature for at least three joint mailings, and pay another person designated by the defendants to run campaign “operations” in Central Brooklyn during the campaign and (as to Yellen) on primary day, and threatened that if they did not, the defendants would cause the Democratic Party to withdraw its endorsement and/or support from the candidates.
Each of the defendants has filed an omnibus motion in which he seeks various forms of relief and each joins in those of his codefendant’s in which he shares a joint interest. Both defendants seek the release and inspection of the grand jury minutes and dismissal of the indictment, asserting that there was insufficient evidence before the grand jury to support the charges. The defendant Norman also moves for dismissal of the indictment on the ground that Penal Law § 155.05 (2) (e) (ix) and § 135.60 (9), which define the forms of extortion and coercion with which the defendants are charged, are unconstitutional as written and as applied. The defendant Feldman moves for dismissal on related grounds, asserting that the court is without jurisdiction over his conduct because the Party had the absolute right to associate and express its ideas freely, and because an endorsement never becomes the “property” of a candidate and cannot be taken or extorted from a candidate. Both defendants also argue that the indictment must be dismissed under the doctrine of lenity.
The defendants’ motions for the court to inspect the grand jury minutes are granted; the court has inspected and reviewed the grand jury minutes. The defendants’ motions for disclosure of the grand jury minutes to them are denied since disclosure is unnecessary for the resolution of their motions. Upon consideration of the voluminous papers submitted by both defendants and the People, and after hearing extensive oral argument from all parties, for the reasons set forth below the defendants’ motions to dismiss the indictment are denied.
*797 The Grand Jury Evidence
In November of 2002, three judges were to be elected to the Civil Court in Kings County On September 10th of that year, a primary election was to be held to determine who would be the Democratic Party candidates for those three positions in November. In order to appear on the primary ballot as a candidate for one of those positions, the candidate was required to collect thousands of signatures from qualified voters. For that purpose, each candidate was required to designate a particular one of the three open positions which he or she was seeking. If only one candidate sought that position, there would be no primary contest for it, and the candidate’s name would automatically appear on the ballot in the November general election. If, however, more than one candidate qualified for a particular position, the candidate would then run in the primary, not only against the other candidate or candidates vying for that same position, but against all of the candidates running in the primary for any of the other contested positions as well. If all three positions were contested in the primary, the three candidates who received the most votes in the Democratic primary would then appear on the ballot in the general election as the Party’s candidates. Given the strength of the Party in Brooklyn, those who appeared as the Democratic candidates for Civil Court in the general election were virtually certain to be elected to those positions.
That year, Yellen was seeking reelection to the Kings County Civil Court, and Sikowitz, a Housing Court Judge, was seeking election to the Kings County Civil Court as well. To assist her in her campaign, Yellen hired Peter Weiss, a political consultant, and Advance Group, Inc., a political consulting firm run by Scott Levinson and Peter Krockondelas, its vice-president for operations. Both judges actively sought, and, in May 2002, received, the endorsement of the District Leaders of the Kings County Democratic Party for two of the three positions. The Party endorsed a third candidate as well. The endorsement of the Party was of great value to these candidates for a number of reasons.
First, each candidate would have about six weeks, from a date in mid-June to one in late July, to collect on petitions the number of voters’ signatures required to get her name on the primary ballot. If a candidate received the Party’s endorsement, the Party would place the candidate’s name on petitions that included the names of other candidates the Party had endorsed *798 for other positions, and Party workers would circulate the petitions throughout Brooklyn. Although even with the Party’s endorsement, a candidate would have to pay her share of the cost of printing, binding and filing the petitions, she would not have to pay the Party workers who obtained the signatures.
While thousands of signatures were required to permit the candidate’s name to appear on the ballot on primary day, many thousands more were necessary to guarantee that the candidate’s place on the ballot would be secure from legal challenges.[1] One of Yellen’s advisers estimated that without the Party’s endorsement it would have cost her campaign an additional $5,000 or $6,000 (for a total of at least $10,000) to obtain enough signatures to immunize the petitions from challenge by an opponent.
Second, the Party would supply legal services to an endorsed candidate if a rival for the same Civil Court position challenged the signatures the endorsed candidate collected or the petitions on which the signatures appeared, or if the endorsed candidate contested a rival’s signatures and petitions. According to Yellen’s advisor, it could cost a candidate between $10,000 and $15,000 to challenge another candidate’s petitions and signatures, or to defend her own against a rival’s challenge.
Third, the Party would undertake primary day “operations” on the candidate’s behalf, that is, on the day of the primary election it would send out workers who would “turn out” the vote, and would distribute to voters approaching the polling place “palm cards” on which the names of the candidates endorsed by the Party were printed. Because these expenses would be shared with other candidates the Party endorsed, whose names would also appear on the handouts, the candidate would enjoy greater primary day coverage at far less expense.
These advantages were of great practical importance to both Yellen and Sikowitz. Neither of their campaigns was well funded, and without the Party’s support, each candidate would have to spend much of the money raised on her behalf just to obtain enough signatures to appear on the primary ballot, leaving her little or no resources for legal challenges or primary day operations. Moreover, because judgeships are generally “low profile” races, Sikowitz, Yellen and Yellen’s advisors believed *799 that most voters would not know the judicial candidates or their qualifications, would not decide for which judicial candidates to vote until immediately before casting their ballot, and might well vote for the person whose name they last saw in whatever literature they received. Distribution of palm cards to the voters just before they entered the polling place would thus play a critical role in giving the candidates name recognition and in identifying them as Democratic Party-endorsed.
Soon after Yellen and Sikowitz were endorsed by the Party, the defendant Feldman asked to meet with them at the Party’s headquarters at 16 Court Street in Brooklyn. In the meeting, Feldman discussed the possibility of their conducting a joint campaign with each other and with the candidate the Party had endorsed for the third Civil Court position. He told them that the plan would require each candidate to contribute her proportionate share of the costs for gathering the signatures and the filing of the petitions. No decisions or commitments were demanded or made in that meeting.
Thereafter, in June and July, more meetings took place at the Party’s headquarters. The grand jury testimony does not include a consistent account concerning the number of meetings, who was present at each, or exactly what occurred at one rather than another. However, it is clear from the testimony that in the first meeting, the defendant Feldman presented a more specific proposal to Yellen, Sikowitz and Robin Carson, the third of the Civil Court candidates the Party had endorsed, who had received the Party’s endorsement after the previously endorsed candidate had dropped out of the race. Feldman wanted the three candidates to run as a slate, combining financial resources on mass mailings, automated telephone calls and ads on cable television and in local newspapers. The campaign literature was to be created and distributed by Branford Communications, whose president was also present at the meeting. Feldman initially estimated that the plan would require contributions of $100,000 from each candidate. The candidates were reluctant to accept the plan, and wanted to see the proposed expenditures itemized on paper.
Neither Yellen nor Sikowitz had $100,000 to contribute from her campaign funds, and for Yellen meeting the demand would, “in essence,” take her campaign “out from under her.” Although sharing expenses with two other candidates for a countywide mailing could be beneficial to Yellen in some respects, Yellen and her advisers were reluctant to agree to a joint cam *800 paign since, as the only incumbent Civil Court Judge, Yellen wanted to distinguish herself from other candidates by highlighting her accomplishments on the Civil Court bench. This was of particular importance because the three top vote getters on the primary ballot would receive the Democratic nominations for the general election, and thus Yellen would, to this extent, actually be running against, rather than with, the other Democratic candidates.
Another meeting or two followed, which took place during the period in which the collection of signatures was already underway. The defendant Feldman was present for both meetings, if more than one occurred. The defendant Norman was present for at least one of them, and perhaps both. Those present discussed the joint campaign proposal, now submitted to the candidates in writing, which included all of the expenses mentioned at the first meeting, except the $25,000 that had been allocated for cable television ads, which all three of the candidates had previously “shot down.” One of Yellen’s advisors thought that this proposal, as revised, “made sense.”
The defendants also presented an additional proposal for a six-week campaign to be conducted for the candidates within specific areas of Central Brooklyn, for which each of the candidates would pay an additional $16,100. That campaign was to be overseen by William Boone III, who was also present. Although in their motion papers both defendants assert that Boone was well qualified for this job, the witnesses in the grand jury testified that they were unfamiliar with him and knew only that he had a connection of some kind with the defendant Norman. Boone was to coordinate the street operations in Central Brooklyn with an assistant and nine workers. The president of Branford Communications, who was also present at the meeting, gave them a separate price for literature to be distributed by Boone’s workers.
Yellen’s advisors concluded that the proposed Central Brooklyn campaign made no sense, since it involved handing out literature to people whose party affiliation was unknown, and would cost more than sending out a mailing targeted specifically to registered Democrats in the area. Yellen and Sikowitz also did not want to participate in the Central Brooklyn campaign, both because they lacked the money to fund it, and because they believed it would be futile to expend resources in those parts of Brooklyn, which were not areas from which white, Jewish women traditionally received much of the vote. (One of *801 Yellen’s advisors characterized the plan as “turning out votes for your opponent.”) Instead, the candidates wanted to allocate their financial resources to areas in which they believed that they stood at least a chance of obtaining support. In addition, one of Yellen’s advisors had already made “deals” with four of the Democratic clubs in Central Brooklyn for assistance on the day of the primary, and those deals required the outlay of far less funds. One of the areas in which he had not made such a “deal” was the defendant Norman’s Assembly District, where Norman himself was running for reelection to the New York State Assembly, and Yellen’s advisors thought that if the defendant Norman was supporting her, his club should be as well, without their having to pay for that support.
Yellen’s advisors’ strategy was to “stretch . . . out” the consideration of these proposals for “as long as we could until we had to make our own decision on how we were going to run our own campaign.” Consistent with their strategy, Yellen’s advisors wanted to delay making a decision and to delay committing financial resources for as long as possible. However, the defendants made clear that the only point of the plan that was negotiable was whether there would be three or four joint mailings. Indeed, the defendant Norman became angry when Yellen and Sikowitz expressed reluctance to accept the proposals, and, when specifically asked what would happen if a candidate refused to do so, he stated emphatically that the Party would “dump her.” “You can run,” he explained, “just not with the backing of this organization.” As one of Yellen’s advisors recalled it, the defendant Norman said of the proposals, “You’re in or you[‘re] out. And if you’re out, you’re out.”
Had either candidate known in April that the defendants would make the continued support of the Party contingent upon acceding to these demands, she could have refused them with sufficient time to plan and fund her own efforts to solicit the necessary signatures. As it was, both agreed to participate in three joint mailings. Facing these demands in the middle of June, Yellen felt compelled to accede to them because, at this point — close to the deadline for obtaining the requisite number of signatures — she had neither the money nor manpower to do so without the Party. Although Sikowitz believed Norman was being “a bully,” still it “never occurred to [her]” that he would really carry out his threats. Nonetheless, she, too, agreed. In the end, only one mailing was sent, at a cost one of Yellen’s advisors had negotiated down by five cents per piece, but still, *802 in his opinion, five to seven cents more than customary. On August 16, 2002, Yellen paid Branford Communications $7,686.05 for her share of the mailing.
Before the second mailing could be sent, Garson had succeeded in making a legal challenge to the petitions of the other candidate vying for her position, and thus would be on the ballot in the general election without having to appear in or win the primary. As a result, she could no longer participate in the primary campaign, increasing the share that both Yellen and Sikowitz would have to pay for the second and third mailings. By Labor Day, Sikowitz decided not to participate in the two remaining joint mailings at all. At the last minute, Yellen’s advisors created and distributed, without using Branford Communications, a mailing for her alone.
After Labor Day, the defendant Feldman called Levinson at Levinson’s office in New York County, demanding that Yellen pay $10,000 for primary day operations. He told Levinson that he wanted the money to be split into two checks. One check, for $9,000, was to be made payable to Boone for operations in Central Brooklyn. The other, for $1,000, was to be made payable to the campaign of Adele Cohen for reelection to the Assembly from the Coney Island area of Brooklyn. Initially, Yellen and her advisors were reluctant to pay for Boone’s operations, again because they did not believe a campaign in Central Brooklyn would be helpful to her candidacy. Yellen and her advisers did not object, however, to the payment to Adele Cohen’s campaign fund, because they believed that Yellen might be able to garner some votes in the area of Brooklyn where Cohen was running for reelection. Levinson spoke to Weiss, another of Yellen’s consultants, and asked him to speak with the defendant Feldman to see if he could negotiate down the amount demanded.
Weiss, who was in his office in Brooklyn, called the defendant Feldman at the Party’s headquarters, and explained that Yellen did not have enough campaign funds to meet the demand. The defendant Feldman told Weiss that “his principal was adamant that the money had to be paid,” but that Feldman would relay Weiss’s request to “his principal.” Weiss asked how the money was going to be spent, but he never received an answer. Other candidates were running in those areas of Central Brooklyn, who would also need palm cards distributed on their behalf. Although judicial candidates are only permitted to pay their proportionate share of the cost of printing literature, there was *803 no way of determining Yellen’s proportionate share of the expense.
Later, the defendant Feldman called Weiss back and repeated that “his principal” was “adamant” that Yellen had to pay the entire $10,000. The defendant Feldman told Weiss that if Yellen did not comply, the Party would not campaign for her on the day of the primary election, not only in Central Brooklyn, where Boone’s operations were to be conducted, but anywhere in the county. Faced with this threat, Yellen agreed to the defendant Feldman’s demand.
On primary day, Weiss saw that in many parts of the county, including three districts in Central Brooklyn, Party campaign workers were distributing palm cards without Yellen’s name, and in several instances were distributing cards with the names of her rivals, candidates the Party had not officially endorsed. Nonetheless, several days after the primary Yellen had the two checks given to the defendant Feldman. She did so for two reasons. First, Levinson, who had promised the defendant Feldman that Yellen would make the payments, would require the defendant Norman’s goodwill in their future dealings. Second, Yellen was hopeful that, having lost the primary, she might yet be considered by the defendant Norman and the Party for appointment to a vacancy on the Supreme Court, a hope that was not, in the end, realized. On September 18, 2003, Boone endorsed and cashed his check.
Assemblywoman Annette Robinson, a District Leader, a New York State Committeewoman, and, along with the defendant Norman, a member of the Party’s Executive Committee, was proffered as a witness by the defendant Norman. She testified that the Party recommended that candidates use particular vendors, including Branford Communications, because those vendors had proven to be more successful and timely in printing petitions and printing and distributing campaign literature. She said, however, that a candidate could decline to use a vendor recommended by the Party and select one of his or her choice. She also testified that it would not be appropriate for the Party to condition its support on the candidate’s use of a recommended vendor or on the candidate’s agreement to run a joint campaign with other candidates. Although the Party might ask a candidate to contribute a certain amount of money to assist in the street operations of the campaign, if the candidate declined, the Party would not insist that the candidate contribute or refuse to support the candidate countywide, because “that would *804 be wrong.” Assemblywoman Robinson said, she had never heard of a candidate losing the Party’s endorsement once it had been given.
The Indictment
Based on this evidence, the grand jury of Kings County returned a 22-count indictment, premised on the theory that by threatening Yellen or Sikowitz with the withdrawal of her endorsement and/or the support and assistance of the Party, the defendants stole or attempted to steal money from their campaign committees (the Committee to Re-Elect Judge Karen B. Yellen, hereinafter Yellen’s campaign committee; and the Committee to Elect Marcia J. Sikowitz as Civil Court Judge, hereinafter Sikowitz’s campaign committee) by forcing them to agree to pay, and — in the case of Yellen’s campaign committee — actually to pay, for various campaign expenses.[2]
The first four counts concern the defendants’ alleged demand that Yellen’s campaign committee participate in the proposed joint election campaign outlined in the two written proposals submitted to her, by paying Branford Communications $46,066 for her share of the joint mailings and by paying Boone $16,100 for the “Central Brooklyn Operations.” The first and third counts charge the defendants with attempted grand larceny in the second degree (Penal Law §§ 110.00, 155.40 [1]) and attempted grand larceny in the fourth degree (Penal Law §§ 110.00, 155.30 [6]), allegedly committed “on or about and between June 1, 2002 and August 19, 2002,” with the first count alleging that the amount the defendants attempted to extort exceeded $50,000, the requisite amount for grand larceny in the second degree, and with both alleging that the larceny was committed by means of extortion, the requisite element for grand larceny in the fourth degree. The second and fourth counts, respectively, charge the defendants with conspiracy in the fourth and fifth degrees (Penal Law § 105.10 [1]; § 105.05 [1]), and allege that they conspired to commit the larcenies the first and third counts allege they attempted to commit.
The next six counts concern the payment of $7,686.05 Yellen’s campaign committee made to Branford Communications as the committee’s share of Branford’s fee for the first (and only) joint *805 mailing. The fifth and. seventh counts charge the defendants with grand larceny in the third degree (Penal Law § 155.35) and grand larceny in the fourth degree (Penal Law § 155.30 [6]), also allegedly committed “on or about and between June 1, 2002 and August 19, 2002,” with the first count alleging that the amount thus extorted exceeded $3,000, the requisite amount for grand larceny in the third degree, and with both alleging that the larceny was committed by means of extortion. The sixth and eighth counts each charge the defendants with conspiracy in the fifth degree (Penal Law § 105.05 [1]), and allege, respectively, that they conspired to commit the larcenies charged in the fifth and seventh counts. The ninth and tenth counts charge the defendants with coercion in the second degree (Penal Law § 135.60 [9]) and conspiracy in the sixth degree (Penal Law § 105.00), on the theory that the defendants forced, and conspired to force, Yellen to pay for the Branford mailing.
The next six counts concern Yellen’s campaign committee’s payment of $9,000 to Boone for the primary day operations in Central Brooklyn, and $1,000 to Adele Cohen’s campaign committee for the primary day operations in Cohen’s district. The eleventh and thirteenth counts charge the defendants with grand larceny in the third degree (Penal Law § 155.35) and grand larceny in the fourth degree (Penal Law § 155.30 [6]), this time allegedly committed “on or about and between June 1, 2002 and September 19, 2002,” with the first count alleging that the amount thus extorted exceeded $3,000, and with both alleging that the larceny was committed by means of extortion. The twelfth and fourteenth counts each charge the defendants with conspiracy in the fifth degree (Penal Law § 105.05 [1]), and allege, respectively, that they conspired to commit the larcenies charged in the eleventh and thirteenth counts. The fifteenth and sixteenth counts charge the defendants with coercion in the second degree (Penal Law § 135.60 [9]) and conspiracy in the sixth degree (Penal Law § 105.00), on the theory that the defendants forced, and conspired to force, Yellen to pay for the primary day operations.
Finally, the last six counts concern the defendants’ alleged demand that Sikowitz’s campaign committee participate in the proposed joint election campaign outlined in the second of the two written proposals submitted to her, by paying Boone $16,100 for the “Central Brooklyn Operations.” The seventeenth and nineteenth counts charge the defendants with attempted grand larceny in the third degree (Penal Law §§ 110.00, 155.35) and *806 attempted grand larceny in the fourth degree (Penal Law §§ 110.00,155.30 [6]), allegedly committed “on or about and between June 1, 2002 and August 1, 2002,” with the first count alleging that the amount the defendants attempted to extort exceeded $3,000, and with both alleging that the larceny was committed by means of extortion. The eighteenth and twentieth counts each charge the defendants with conspiracy in the fifth degree (Penal Law § 105.05 [1]) and allege, respectively, that they conspired to commit the larcenies that the seventeenth and nineteenth counts allege they attempted to commit. The twenty-first and twenty-second counts charge the defendants with attempted coercion in the second degree (Penal Law §§ 110.00, 135.60 [9]) and conspiracy in the sixth degree (Penal Law § 105.00), on the theory that the defendants attempted to force, and conspired to force, Sikowitz to pay for the primary day operations.
The Sufficiency of the Grand Jury Evidence
The defendants challenge the legal sufficiency of the evidence to support the charges in the indictment. “ ‘Legally sufficient evidence’ means competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof.” (CPL 70.10 [1]; People v Manini, 79 NY2d 561, 568 [1992].) The evidence presented to a grand jury is legally sufficient to support the charges, if, when “viewed in the light most favorable to the People, [and] if unexplained and uncontradicted, [it] would be sufficient to warrant conviction by a trial jury.” (Id. at 568-569; People v Jennings, 69 NY2d 103, 114-115 [1986].)
A person commits the crime of larceny when he “steals property,” that is, “when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.” (Penal Law § 155.05 [1].) A person commits larceny “[b]y extortion” when “he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will” engage in any of nine forms of conduct. (Penal Law § 155.05 [2] [e].) Similarly, a person commits the crime of coercion in the second degree when he “compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in ... by means of instilling in him a fear that, if the demand is not *807 complied with, the actor or another will” engage in any of the same nine forms of conduct. (Penal Law § 135.60.)[3] Thus, “coercion . . . and larceny by extortion . . . are parallel crimes. Coercion, in essence, consists of compelling a person by intimidation to engage [in] or refrain from . . . certain conduct. Extortion is compelling a person by intimidation to turn over property.” (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 135.60, at 415 [2004] [citations omitted].) Because the crimes are similarly defined and “the kinds of threatened consequences that would befall an uncooperative victim are similarly enumerated” (id.), the same governing principles apply to both.
In this case, all of the counts charging the defendants with grand larceny or attempted grand larceny by extortion, or conspiracy to commit those crimes, and all of the counts charging the defendants with coercion in the second degree or attempted coercion in the second degree, or conspiracy to commit those crimes, are based on the theory that the defendants threatened or conspired to threaten Yellen or Sikowitz with the same form of conduct: that the defendants would “[p]erform [an] act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.” (Penal Law § 135.60 [9]; § 155.05 [2] [e] [ix].) The Legislature added this “catch-all” provision “because of the impossibility of comprehensively defining coercive or extortionate conduct by a list of more specific threats.” (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 135.60, at 415 [2004], quoting 1964 Staff Notes of Commn on Revision of Penal Law, reprinted in McKinney’s Cons Laws of NY, 1964 Spec Pamph, at 346.) The Staff Notes offer as one example of “otherwise unpenalized conduct” the provision was meant to encompass “the achievement of an objective by a property owner’s threat to grow ragweed adjacent to his allergic neighbor’s house.” (Id.)
*808 With respect to the first 10 counts of the indictment, the grand jury could find from the evidence before it that:
(1) the defendants, acting in concert, demanded that Yellen, through her campaign committee, spend more than $60,000 on a joint campaign that would include paying Branford Communications more than $40,000 for at least three joint mailings and paying Boone more than $16,000 for campaign operations in Central Brooklyn;
(2) the defendants threatened to withdraw the Committee’s endorsement of and/or support for Yellen if she did not comply with these demands, and they did so in order to compel her to pay Branford and Boone; and
(3) Yellen and her campaign committee were induced by the threat to agree to fund the joint campaign and to pay Branford Communications more than $7,000 for the first (and only) joint mailing.
With respect to counts 11 through 17 of the indictment, the grand jury could find from the evidence before it that:
(4) the defendants, acting in concert, demanded that Yellen, through her campaign committee, pay Boone $9,000 for primary day operations in Central Brooklyn;[4]
*809 (5) the defendants threatened that no primary day operations would be conducted anywhere in Brooklyn on Yellen’s behalf if Yellen did not pay for Boone’s operation, and they did so in order to compel her to pay Boone; and
(6) Yellen was induced by the threat to agree to pay Boone and did so only after losing the primary.
With respect to counts 18 through 22 of the indictment, the grand jury could find from the evidence before it that:
(7) the defendants, acting in concert, demanded that Sikowitz, through her campaign committee, pay Boone more than $16,000 for campaign operations in Central Brooklyn, and did so in order to compel her to pay Boone; and
(8) Sikowitz did not pay, or agree to pay Boone, but the defendant’s conduct came very close to compelling her to do so. Thus, the evidence is legally sufficient to establish that the defendants threatened and conspired to threaten Yellen and Sikowitz with conduct that would have damaged their campaigns, and thus their quests for office, and that was calculated to do so; that by making these threats the defendants attempted to cause Yellen to pay, and, in part, actually caused Yellen and her campaign committee to pay, Branford Communications and Boone for campaign expenses she had a legal right not to incur,[5] and attempted to cause Sikowitz and her campaign committee to pay Boone for campaign expenses she had a legal right not to incur, and that the amounts the defendants demanded Yellen and Sikowitz to pay, and that Yellen actually paid, met the thresholds for the degrees of larceny and conspiracy charged.[6]
*810 The question remains whether the evidence is legally sufficient to establish that the conduct in which the defendants allegedly threatened to engage was conduct that “would not in itself materially benefit the actor [s].” (Penal Law § 135.60 [9]; § 155.05 [2] [e] [ix].) When the term “benefit” is used in the Penal Law, it generally includes not only “any gain or advantage to the beneficiary,” but also “any gain or advantage to a third person pursuant to the desire or consent of the beneficiary.” (Penal Law § 10.00 [17].)[7] However, the requirement here that the conduct threatened be such as “would not in itself materially benefit the actor” (Penal Law § 135.60 [9]; § 155.05 [2] [e] [ix] [emphasis supplied]) mandates that the conduct be such as would not benefit only the person or persons making the threat. Nonetheless, even this more limited meaning of “benefit” must be read to include a “gain or advantage” to the actor in the actor’s representative capacity, as well as personally. Thus, a threat to engage in conduct that would be of material benefit to the defendant Norman as a Party leader and the defendant Feldman as the Party’s executive director — that is conduct that would materially benefit the Party — would not qualify as an extortionate or coercive threat.
The defendants argue that the actions they took were intended to further the legitimate interests of the Party, and that the evidence before the grand jury cannot be legally sufficient to establish that their actions were not.[8] More specifically, the defendant Feldman argues that if the Party determined that a candidate was not “taking proper measures” to ensure victory, the Party had the right and the obligation “to rectify *811 the situation,” even if that meant withdrawing a previously given endorsement.[9] The People argue that conduct that could result in the defeat of candidates the Party had endorsed would only weaken it, and could not benefit either the defendants or the Party they led.
Of course, Yellen and Sikowitz had no legal right to be endorsed by the Party, or to continue to be endorsed or supported by the Party, and the Party had the legal right to endorse and to withdraw the Party’s endorsement and support from any candidate it chose. (Eu v San Francisco County Democratic Cent. Comm., 489 US 214, 224 [1989] [“Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association”]; California Democratic Party v Jones, 530 US 567, 575 [2000] [“In no area is the political association’s right to exclude more important than in the process of selecting its nominee”].) However, extortion and coercion may be committed by threats to engage in conduct that is otherwise legal (People v Dioguardi, 8 NY2d 260, 271 [1960] [“(the) entire character (of picketing by a labor union) changed from legality to criminality . . . when it was used as a pressure device to exact the payment of money as a condition of its cessation”]), and a person may commit extortion or coercion by making a lawful demand for an unlawful reason. (People v Forde, 153 AD2d 466, 473 [1st Dept 1990] [defendant committed extortion when he “threatened the use of the otherwise legal ‘matching’ clause (of a labor contract) to harm (the victim’s) company business, unless (the victim) paid him $2,000, since the defendant’s use of the ‘matching’ clause was intended to extort money, rather than to carry out a legitimate objective of the Union”]; see also United States v Enmons, 410 US 396, 406 n 16 [1973] [for defendant charged with violation of the federal Hobbs Act, which incorporated New York’s definition of extortion, “when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate”].)
Applying these concepts to the words used in defining the crimes of extortion and coercion, determining whether or not the action threatened would be of material benefit to the actor *812 requires consideration of what the actor demands the alleged victim do to avoid having the threat carried out. For example, when a union official threatens that unless the employer makes a cash payment to him, he would require that the employer use the percentage of union labor mandated by the company’s contract with the union, the action threatened — enforcing the union contract if the payment is not made — would be of no benefit to the union official in his representative capacity, since the purpose of the threat is to obtain the bribe rather than to employ more union members. (See People v Forde, 153 AD2d 466 [1st Dept 1990]; see also People v Weinseimer, 117 App Div 603, 616 [1st Dept 1907], affd 190 NY 537 [1907] [extortion conviction of defendant, president of plumbers’ union, affirmed based on evidence he demanded money from complainant to avoid a strike].)
On the other hand, when a union official threatens to picket a company unless the company agrees to hire a firm that uses the union’s members, the action threatened — picketing unless such a firm is hired — would materially benefit the union official in his representative capacity by furthering the interests of the union and its membership. (People v Adelstein, 9 AD2d 907 [2d Dept 1959], affd without op 8 NY2d 998 [1960].) As the United States Supreme Court has itself observed, “judicial construction of the New York statute reinforces the conclusion that, however militant, union activities to obtain higher wages do not constitute extortion. For extortion requires an intent ‘to obtain that which in justice and equity the party is not entitled to receive.’ ” (United States v Enmons, 410 US at 406 n 16, quoting People v Cuddihy, 151 Misc 318, 324 [Ct Gen Sess, NY County 1934], affd 243 App Div 694 [1935].)
As is clear from Adelstein, when the conduct demanded is not the payment of a bribe, but action which, at least on its face, has a proper purpose, some evidence is required tending to establish that its purpose is, in fact, illegitimate. In that case, the defendant, a business manager and officer of a union that represented “cartmen” (sanitation workers), was convicted of extortion based on a threat to three store owners that unless they ceased doing business with a nonunion carting company and chose a new company from a list of nine approved by the union, their stores would be picketed. The store owners chose the first carter on the list, a corporation in which the union officer’s codefendants had an interest, and which had a contract *813 with the union. Although the contract was “produced under circumstances which engender[ed] suspicion as to its validity,” and the corporation had not made required contributions to the union, the court reversed the conviction, holding that “[t]he proof was insufficient to establish beyond a reasonable doubt (1) that appellant was actuated by the purpose of obtaining a financial benefit for himself or his codefendants and was not attempting in good faith to advance the cause of unionism, or (2) that there was any relationship among appellant and his codefendants which would sustain the inference that they aided each other in securing any personal benefit from the termination of the services of the nonunion cartmen.” (9 AD2d at 908; see also United States v Enmons, 410 US 396, 406 n 16 [1973] [quoting Adelstein’s holding as a statement of New York law].)
In this case, there is insufficient evidence from which the grand jury could conclude that the defendants sought or obtained a financial benefit for themselves — for example, by a bribe to be given directly to them, or by a kickback of monies paid to Branford Communications or Boone. However, evidence of a demand for a bribe or kickback is one way, but not the only way, in which the People may establish that the conduct threatened would not have been for the benefit of the defendants or their Party. In this case, unlike in Adelstein, there is — even absent evidence of a bribe or kickback — sufficient evidence to satisfy that element.[10]
First, it is apparent from the evidence before the grand jury that candidates for judicial office in jurisdictions that are dominated by one party or another are particularly vulnerable to the demands party leaders make in exchange for securing or maintaining the party’s support, and that the power this gives to party leaders is susceptible to abuse. In this case, as the People contend, the grand jury could infer from the timing of the defendants’ demands — first, in the midst of the window of time when signatures could be gathered, and second, days before the primary election itself — that the defendants exercised that power in order to maximize its coercive effect, and in a manner that was not for the Party’s benefit.
*814 According to the evidence before the grand jury, prior to receiving the Party’s endorsement, neither Yellen nor Sikowitz was informed that the Party’s support would be conditioned on their waging their campaigns in a particular manner, using particular vendors, or funding particular operations. Moreover, even after they received the Party’s endorsements, the defendant Feldman met twice with them without making clear that his recommendations were, in fact, nonnegotiable demands. Thus, it appears from the evidence before the grand jury that the defendants did not determine in advance of the endorsements whether Yellen or Sikowitz would wage a joint campaign, spend any particular amount of money, incur any particular expense, or employ any particular vendor or person. Instead, the grand jury could find that the defendants first made their demands more than a month after the endorsements were given, at a time when the Party might no longer be able to place newly endorsed candidates on the primary ballot and effectively support them in the primary campaign. From this the grand jury could conclude that the conduct in which the defendants threatened to engage would not have materially benefitted the Party in any legitimate way, since it could have resulted in the loss by candidates endorsed by the Party to candidates the Party had not endorsed (which, in fact, was the outcome of this primary), thus weakening the Party’s political influence and that of the defendants.
Second, although Assemblywoman Robinson testified that the Party recommended Branford because it had proven to be more successful and timely in printing and distributing campaign literature, and even though one of Yellen’s advisors conceded that Branford’s president was “very good” and that he had “a lot of clients,” there was no legal obligation, like the labor contract in Adelstein, mandating that Party endorsed candidates use Branford. Moreover, while it may have been in the Party’s interest to recommend Branford as one company that could do the job effectively, preparing and distributing campaign literature is not the kind of specialized skill that only one vendor could or did possess. Thus, the grand jury could have concluded that the Party had no reason to demand that candidates use Branford, and only Branford, or suffer loss of the Party’s endorsement or support. Indeed, this inference is supported by other testimony from Assemblywoman Robinson, a member of the Party’s executive committee, and a witness proffered to the grand jury by the defendant Norman, that a candidate was free *815 to decline to use a vendor recommended by the Party and that it would not be appropriate for the Party to condition its support on the candidate’s use of that vendor.
Third, the manner in which the defendants demanded that Yellen and Sikowitz fund the Boone operations in Central Brooklyn before the primary, and that Yellen fund Boone’s operations on the day of the primary itself, also permitted the grand jury to infer that the purpose of the demands was improper and not for the benefit of the Party. “Although the political elective process for the judiciary makes judicial candidates political party candidates, they are not as others,” and they “may not contribute to the political war-chests of other candidates.” (Matter of Rosenthal v Harwood, 35 NY2d 469, 473 [1974], citing Code of Judicial Conduct Canon 7.)[11] Thus, while judicial candidates need to know, and be able to establish, that they are funding only their own proportional share of campaign expenses, Yellen and Sikowitz received only the sparsest documentation for the $16,100 they were each told they had to pay Boone for the operations he was to conduct before primary day, typed out on a single piece of paper without even a letterhead.[12] Significantly, they received no information concerning whether Boone’s operations would benefit other candidates the *816 Party had endorsed in other races, and if so, what if any, contribution to the expenses those other candidates would be making. When questions about this subject were asked, neither defendant would answer them. No documentation was offered at all for the operations Boone was to conduct on the day of the primary, and the defendant Feldman outright refused to give any explanation at all about how Boone would spend the $9,000 Feldman was demanding. In addition, the defendant Feldman directed that Yellen’s committee make the check for the campaign payable to Boone personally, and when Boone later received it, he simply endorsed and cashed it. And once again, the inference that may be drawn from the evidence — that these demands were not made for the benefit of the Party — is buttressed by the testimony of Assemblywoman Robinson that it would be “inappropriate” or “wrong” for the Party to withdraw its support from a candidate who chose not to contribute money to operations like those to be conducted by Boone.
Finally, the defendants could well argue that a joint campaign and joint mailings were in the Party’s interest, since, even if Yellen would benefit from waging an individualized campaign and highlighting her experiences as an incumbent in her own mailings, the Party would benefit more from the election of all three of its endorsed candidates for Civil Court than just one of them. Still, the grand jury could infer that even this demand was not made for the benefit of the Party, given that it was not made until after the endorsements were already announced, and given the testimony of Assemblywoman Robinson that it would not be appropriate for the Party to condition its support on the candidate’s agreement to run a joint campaign with the other candidates.
In sum, while the defendants claimed in their motion papers and at oral argument that they acted for the benefit of the Party, and while those claims may be presented to the jury at trial, the evidence presented to the grand jury, when “viewed in the light most favorable to the People, [and] if unexplained and uncontradicted, [is] sufficient to warrant conviction by a trial jury.” (People v Manini, 79 NY2d at 568-569.) Accordingly, the motion to dismiss or reduce those charges is denied.
The Constitutional Challenges
The defendants argue that even if the evidence was legally sufficient to support the charges against them, the indictment must nonetheless be dismissed on several related constitutional *817 grounds. Statutes enacted by the Legislature are presumed to be constitutional, and the party who claims that they are invalid bears “the heavy burden” of demonstrating their unconstitutionality. (People v Bright, 71 NY2d 376, 382 [1988], citing People v Pagnotta, 25 NY2d 333, 337 [1969]; Fenster v Leary, 20 NY2d 309, 314 [1967]; Matter of Van Berkel v Power, 16 NY2d 37, 40 [1965].) That burden has not been met here.
The defendant Norman argues that if the extortion and coercion statutes can reach the conduct in which he allegedly engaged — which he characterizes as speech protected by the First Amendment — each is either unconstitutional on its face or as applied. The defendant Feldman argues that this court has no jurisdiction over the crimes charged in the indictment because political parties have absolute discretion to grant or to withhold endorsements and their ability to do so can only be abridged by violating the First Amendment. The defendant Norman also argues that the statutes are unconstitutionally over-broad and vague, and failed to provide him with notice that retraction of the Party’s endorsements would be construed as “calculated to harm another person materially,” and would not be construed as “materially benefiting] ” himself, Feldman or the Party. Finally, both defendants claim that the proper application of the extortion and coercion statutes to their conduct is ambiguous, and that the rule of lenity requires that the ambiguity be resolved in their favor.
“[A]ny proscription of pure speech must be sharply limited to words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence or other breach of the peace.” (People v Dietze, 75 NY2d 47, 52 [1989].) Where a statute makes “criminal a form of pure speech, [it] must be interpreted with the commands of the First Amendment clearly in mind.” (Watts v United States, 394 US 705, 707 [1969].) Thus, for example, a statute proscribing a candidate for public office from offering material benefits to voters in consideration for their votes could not constitutionally be applied to a candidate who publicly promised to lower his salary if elected. (Brown v Hartlage, 456 US 45 [1982].)
However, the constitutional guarantee of freedom of speech does not immunize “speech or writing used as an integral part of conduct in violation of a valid criminal statute.” (Giboney v Empire Stor. & Ice Co., 336 US 490, 498 [1949] [rejecting First Amendment challenge to an injunction forbidding unionized distributors from picketing to force an illegal business arrange *818 ment].) As the Supreme Court has stated, “it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.” (Id. at 502.) Simply put, “extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.” (United States v Quinn, 514 F2d 1250, 1268 [5th Cir 1975].)
Similarly, the prosecution of an unlawful extortionate or coercive threat does not violate the First Amendment’s right of association simply because the threat was made in a political context. Thus, in Jund v Town of Hempstead (941 F2d 1271, 1283 [2d Cir 1991]), the Second Circuit held that the punishment of political committees in a Racketeer Influenced and Corrupt Organizations Act suit was not prohibited by the First Amendment because it was imposed for their past employment of a “longstanding coercive solicitation scheme,” and not for “their advocacy or their political positions.” While “agreements to engage in illegal conduct undoubtedly possess some element of association,” such agreements may be prohibited by criminal statutes “without trenching on any right of association protected by the First Amendment,” even if it “may have an impact in the political arena.” (Brown v Hartlage, 456 US at 55.)
The extortion and coercion statutes at issue here violate neither the right to free speech nor the right of association. While the conduct each statute targets unquestionably includes speech, and while in this case the speech was uttered in the context of a political party’s endorsements of candidates for public office, each statute requires that the speech constitute a threat that the speaker will cause the victim “material harm” and that the conduct threatened be such that it would not “materially benefit” the actor. (Penal Law § 135.60 [9]; § 155.05 [2] [e] [ix].) Because the statutes are thus focused on threats of damage made for no legitimate purpose, they fall outside “ ‘the realm of social or political conflict where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas, broadly conceived to embrace the rough competition that is so much the staple of social or political discourse.’ ” (United States v Jackson, 986 F Supp 829, 833 [SD NY 1997], vacated on other grounds 180 F3d 55 [2d Cir 1999] [error in jury instructions], revd on rearg 196 F3d 383 [2d Cir *819 1999] [conviction restored because error was harmless], quoting United States v Velasquez, 772 F2d 1348, 1357 [7th Cir 1985].)[13] For the same reasons, application of these statutes to the conduct with which the defendants are charged does not impermissibly interfere with the “internal administration of [a] party organization.” (Smith v Pigeon, 174 Misc 2d 97, 101-102 [Sup Ct, Erie County 1997].)
Neither are these statutes impermissibly vague. A Penal Law statute is not void for vagueness if it “provide[s] sufficient notice of what conduct is prohibited” (People v Bright, 71 NY2d at 382 [citation omitted]), and if it does “not permit arbitrary or discriminatory enforcement” because it includes “minimal guidelines to govern law enforcement.” (Id. at 383 [internal quotation marks omitted]; see Grayned v City of Rockford, 408 US 104, 108-109 [1972].) Given that attacks on the constitutionality of statutes “are generally disfavored,” when a statute is challenged both on its face and as applied, the court must first “decide whether the assailed statute is impermissibly vague as applied to the defendant,” and “[i]f it is not, . . . that is the end of the matter” (People v Stuart, 100 NY2d 412, 422 [2003]), because “the court will not strain to imagine marginal situations in which the application of the statute is not so clear.” (Id. [internal quotation marks and citations omitted].) Rejection of a challenge to a statute on the ground that it is void for vagueness as applied confirms the statute’s facial validity, “because, in rejecting the as-applied challenge, the court will have necessarily concluded that there is at least one person — the defendant — to whom the statute may be applied constitutionally.” (Id. at 422-423.)
The defendants claim that these statutes fail to advise the ordinary citizen that speech intended to embody political decision making and to enforce party discipline is actually encompassed by the statutes. However, threatening to engage in conduct that would not materially benefit a political party — the threats the defendants allegedly made in this case — embodies *820 neither legitimate political decision making nor a legitimate exercise of party discipline. While the language of the statutes is broad enough to apply to many kinds of illicit conduct, it may certainly be understood to encompass the conduct charged here, and to exclude the “expression of ideas or thoughts other than threats and/or intimidating or coercive utterances.” (People v Shack, 86 NY2d 529, 538 [1995].) Moreover, the statutes “adequately define[ ] the criminal conduct for the police officers, Judges and juries who will enforce [them].” {Id. at 539.) Accordingly, these statutes are not vague as applied to the conduct with which the defendant is charged, and “that is the end of the matter.” (People v Stuart, 100 NY2d at 422.)[14]
The defendants’ challenge to these statutes as overbroad is also without merit. A statute is overbroad if it “either could never be applied in a valid manner or . . . even though it may be validly applied to the [individual], it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties.” (New York State Club Assn., Inc. v City of New York, 487 US 1, 11 [1988] [internal quotation marks and citation omitted].) The defendants have standing to raise such a challenge only if, as to either statute in question, there is a “realistic danger that the statute itself will significantly compromise recognized First Amendment protections of [other] parties not before the Court” (Members of City Council of City of Los Angeles v Taxpayers for Vincent, 466 US 789, 801 [1984]), and “only if it reaches substantially beyond the permissible scope of legislative regulation.” (Id. at 800 n 19.) Because neither statute criminalizes speech, but only threats of conduct intended to cause substantial harm to another, and to be no benefit to the person or persons making the threats, the “legitimate reach [of the statutes] dwarfs [their] arguably impermissible applications.” (New York v Ferber, 458 US 747, 773 [1982]; see also People v Shack, 86 NY2d at 538.) Accordingly, the defendants have failed to establish that they have standing to challenge the statutes as overbroad. In any case, the statutes are not over-broad, since “the ‘threats’ prohibited by [these statutes] are not expressions of ideas or advocacy that typically implicate the First Amendment.” (United States v Jackson, 986 F Supp at 833 [rejecting an overbreadth challenge to Penal Law § 155.05 *821 (2) (e) (v) and 18 USC § 875 (d), a comparable federal statute].)[15]
Finally, the indictment need not be dismissed based upon the doctrine of lenity. According to that doctrine, “ ‘ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity’ ” (Huddleston v United States, 415 US 814, 830 [1974], quoting Rewis v United States, 401 US 808, 812 [1971]; United States v Bass, 404 US 336, 347 [1971]). The doctrine reflects the proposition that “no individual [is to] be forced to speculate, at peril of indictment, whether his conduct is prohibited” (Dunn v United States, 442 US 100, 112 [1979]), and requires courts to “decline to impose punishment for actions that are not plainly and unmistakably proscribed.” (Id. at 112-113 [internal quotation marks and citation omitted].)
However, lenity is a “doctrine of last resort” (United States v Dauray, 215 F3d 257, 264 [2d Cir 2000]), and will be invoked only if a court can only make “no more than a guess as to what [the Legislature] intended.” (Muscarello v United States, 524 US 125, 138 [1998] [internal quotation marks and citation omitted].) A statute is not ambiguous merely because it is being applied in new or different circumstances. (United States v Lanier, 520 US 259, 271 [1997].) Here, as in Lanier, “the statute[s], either standing alone or as construed, made it reasonably clear at the relevant time that the defendant [s’ alleged] conduct was criminal.” (Id. at 267; see United States v Gillock, 445 US 360, 373 n 11 [1980] [“Of course, even a Member of Congress would not be immune under the Federal Speech or Debate Clause from prosecution for the acts which form the basis of the Hobbs Act . . . charges here”].)

. Such challenges might be based, for example, on assertions that a person whose signature appeared on the candidate’s petitions was not a registered voter or was not enrolled in the Party, or that the voter’s name was printed rather than signed, or that the signature was illegible.

. The factual allegations in the indictment itself do not include all of the details which follow. Those that do not are taken from the People’s bill of particulars and from their response in opposition to the defendants’ pretrial omnibus motions.

. One form is slightly different. A person commits larceny by extortion when he obtains property by threatening to “[c]ause physical injury to some person in the future” (Penal Law § 155.05 [2] [e] [i]), while a person commits coercion in the second degree when he compels another to engage in conduct by threatening to “[clause physical injury to a person.” (Penal Law § 135.60 [1].) The words “in the future” appear in the definition of larceny by extortion to distinguish it from the definition of robbery, which is committed by a person who obtains property by “us[ing] or threatening] the immediate use of physical force upon another person.” (Penal Law § 160.00; see People v Woods, 41 NY2d 279 [1977].)

. The evidence before the grand jury indicates this threat was uttered to Yellen’s advisors only by the defendant Feldman, in telephone conversations in which the defendant Norman played no part, but in which Feldman stated that his “principal,” obviously meaning the defendant Norman, was adamant that the money for Boone’s primary day operations be paid and that the amount to be paid would not be reduced. The evidence before the grand jury was sufficient to establish a prima facie case that both defendants participated in an overarching conspiracy to extort money from Yellen and Sikowitz’s campaign committees and to coerce them into engaging in conduct in which they had a right not to engage, and that the defendant Feldman’s statements were made in furtherance of that conspiracy. Based on that showing, the statements were properly considered by the grand jury as evidence against the defendant Norman. (People v Salko, 47 NY2d 230 [1979].) This is so even though the People did not ask the grand jury to return a conspiracy charge reflecting that overarching conspiracy, and instead asked the grand jury to consider several conspiracy charges which limited the conspiratorial agreements to particular demands, payments and threats. (See People v Luciano, 277 NY 348, 358 [1938] [when conspiracy is shown, acts and declarations of conspirators in furtherance of its purpose and object are competent evidence of defendant’s commission of substantive crimes even though crime of conspiracy not charged]; People v Warren, 156 AD2d 972 [4th Dept 1989]; People v Comfort, 151 AD2d 1019 [4th Dept 1989]; see also People v Tran, 80 NY2d 170 [1992] [admitting coconspirator statement where defendant charged with bribery but not conspiracy]; People v Gonzalez, 120 AD2d 888 [3d Dept 1986] [although trial court later dismissed conspiracy charge at close of evidence, coconspira *809 tor statement properly received in evidence based on prima facie proof of conspiracy].)

. Compelling a victim to deliver up property by threatening to engage in one of the nine specified forms of conduct constitutes grand larceny by extortion even if the person to whom the property is delivered is someone other than the person making the threat. See Penal Law § 155.05 (1), which requires for larceny that the person act with “intent to deprive another of property or to appropriate the same to himself or a third person”; and Penal Law § 155.05 (2) (e), which provides that a person commits larceny by extortion when, by making such a threat “he compels or induces another person to deliver such property to himself or to a third person.” (Emphasis added.)

. The defendant Norman argues that Judge Yellen received services from Branford Communications and Boone and, having gotten “what she paid for,” suffered no loss. However, the grand jury could infer from the evidence before it that Yellen and her campaign committee did not want, or perceive as beneficial, either the mailings from Branford or whatever services Boone rendered, and would not have agreed to accept or pay for either absent the compulsion created by the defendants’ threats. Thus, the grand jury could conclude that *810 the payments Yellen’s campaign committee made to Branford and Boone were stolen, and that the value of the property stolen was the entire amount paid.

. Penal Law § 10.00 (7) defines a “person” as “a human being and, where appropriate, a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality.” Thus, in appropriate cases, a “person” may include a political party.

. The defendant Feldman maintains that this element must be strictly construed because previous incarnations of the extortion statute did not include it, and required instead only that the conduct be “wrongful.” Because the legislative history is silent on this provision, under the ordinary rules of statutory construction, where the Legislature has amended a statute, the amendment indicates that the Legislature “intended to materially change the law,” and a court must “construe the law so that [the Legislature’s intent] may be effectuated.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 193, Comment, at 357 [1971].) Consistent with that requirement, this court’s analysis of the sufficiency of the evidence gives particular meaning to that element of the offense that the conduct threatened be such as “would not in itself materially benefit the actor[s].” (Penal Law § 135.60 [9]; § 155.05 [2] [e] [ix].)

. Although the defendants contend that they acted reasonably in insisting that Yellen and Sikowitz use other professionals in their campaigns in part because they doubted the ability of Levinson and Weiss, there was no evidence before the grand jury concerning the competence of either advisor or of the defendants’ opinions of their competence.

. The defendant Feldman claims that the conduct with which he is charged does not constitute larceny, because an endorsement never becomes the “property” of a candidate and cannot be taken or extorted from a candidate. Whatever the merits of that argument, the property the defendants are charged with stealing and attempting to steal is not the Party’s endorsement, but rather the monies to be paid to Branford Communications and Boone.

. For the current rules, see the Rules of the Chief Administrator of the Courts, which provide that for incumbent judges and others running for judicial office, “prohibited political activity shall include: ...(h) soliciting funds for, paying an assessment to, or making a contribution to a political organization or candidate” (22 NYCRR 100.5 [A] [1]; see also Judicial Campaign Ethics Handbook, NY Advisory Comm on Judicial Ethics, at 8 [2003] [“A judicial candidate may not make a payment to a political party’s campaign committee that is supporting all candidates endorsed by the party, but may reimburse such a committee or organization for his/her proportionate share of the campaign costs. Opinion (of the Commission) 01-21 (Vol. XIX)”]).

. The piece of paper included only the following information:
“Budget
“(6 Weeks)
“COORDINATOR..............................................................$3,000
“ASSISTANT......................................................................$1,500
“CREW (8 People) $200. per week...................................$9,600
“MISCELLANEOUS..........................................................$2,000
“FOOD, TRANSPORTATION, ETC.
“TOTAL $16,100
“THIS WILL COVER THE FOLLOWING:
“POSTERING, LITERATURE DROPS, CHURCHES IN THE
“42nd, 43rd, 55th, 57th and 58th AD.”

. The defendants insist that the statutes must be subjected to strict scrutiny, a standard applicable to statutes that allegedly deny equal protectionby infringing on fundamental rights. (Golden v Clark, 76 NY2d 618, 623 [1990].) However, “[t]he threshold determination” before employing that test “is whether the challenged provision establishes a classification which burdens those rights” (id.), which neither the extortion nor coercion statute does. (Compare Bullock v Carter, 405 US 134 [1972] [Texas filing fees to have name placed on ballot in primary unconstitutional because they denied equal protection].)

. For these reasons, State v Steiger (162 Ariz 138, 781 P2d 616 [1989]), cited by the defendant Norman, is irrelevant here.

. State v Robertson (293 Or 402, 413, 649 P2d 569, 577 [1982]), cited by the defendant Norman, held overbroad that part of Oregon’s coercion statute premised on the threat to “expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt, or ridicule.” (Internal quotation marks omitted.) In Jackson, the court concludedthat Robertson’s holding was inapplicable to Penal Law § 105.05 (2) (e) (v), which defines larceny as including obtaining property by such a threat, because Robertson, rather than calling into question that form of larceny by extortion, found instead that the Oregon statute had “impermissibly extended the principle of extortion to cover threats made in a public setting designed to inform and perhaps involve others in the issues posed by the demand.” (United States v Jackson, 986 F Supp at 833-834, citing State v Robertson, 293 Or at 436, 649 P2d at 590.) Since this case involves extortion and coercion charges premised on a different kind of threat entirely, Robertson’s holding is irrelevant here.